Rives, J.
The first enquiry in this case, is into the character of the negotiable note, which was purchased by the appellant of William A. Wyatt in March 1863. If that note is to be taken according to the understanding of the parties as payable in Confederate notes, then it is subject to be scaled under the act of March 3, 1866. If, however, it expresses a specie debt, it can only be discharged in that constitutional currency, dollar for dollar, and admits of no reduction unless by the operation of the legal tender law of congress. In this latter case, the judgment must be for the dollars expressed on its face. There can be no intermediate ground; and I am free to say that if in this investigation I should come to the conclusion that the note in question, belongs to this latter class of demands, I would sanction no compromise of so clear a right, but concede a recovery to the full nominal amount. It is, *339 therefore noticeable that the holder of this note while resisting its payment in Confederate notes as of the date of its maturity, acknowledges in his answer that - either one of two settlements would be acceptable to him; namely, the value of the Confederate currency at the date of the note, or the value of the property, as represented by the note. The bill sets out a Confederate contract, solvable in Confederate notes. The averment is plain and distinct that “the notes were to be paid in 4 Confederate currency’ and none other, when they should mature.” This is denied by the appellant in his answer sub modo only. He limits himself to a restricted disclaimer of 4 4 any understanding •or agreement on his part to receive payment thereof' at maturity in Confederate treasury notes, however much depreciated they might be.” He nowhere denies his obligation generally to receive this currency; but leaves it to be inferred that if it had not depreciated, ■and for a stronger reason, if it had appreciated, he would not have made the objection. His claim, therefore, rests not upon the fact that the note was not truly payable in Confederate currency, but rather upon the grievous depreciation of that currency at the maturity of the note. "When we take,.in connection with this qualified denial, the fact already mentioned, that the answer advances no other claim, nor asserts any other right, but “to receive either what the money represented by the note was worth in gold at the time of the purchase, or the value of the property as represented by the note,” we cannot escape the conclusion that there is nothing in the answer of the appellant that denies the character given to this note by the bill, or disputes the receivability of Confederate notes. His pretension is simply, that he should not bear the loss of this depreciation, but should receive either the worth of this currency at the execution of the note, or else, the proportionate value of the real estate represented *340 by this particular instalment of the purchase money therefor.
The answer of the other defendant in this cause, ¥m. A. Wyatt, is stronger upon \this point. After-setting out with the same restricted denial of an agreement “to receive payment in Confederate currency, however depreciated it might be,” this respondent goes further and asserts “ the right to claim legal cun-ency in discharge thereof.” But the respondent is confronted with his own deposition in this cause, wherein he acknowledges that he had previously given another answer, which contained this distinct declaration that “ the sale was made wholly with reference to Confederate currency. The cash payment was in Confederate currency, and this respondent expected the credit payments to be made in like currency, or such other as might be in circulation at the maturity of the notes.” This testimony discloses the respondent’s ignorance of the legal force of the answer filed, and sufficiently proves the understanding for Confederate currency. Thus stands the case upon the pleadings.
But when we look into the circumstances attending the contract, and recall the historical fact that at that time Confederate money was the only circulation, we cannot doubt that all the parties contemplated a payment in that currency. The price of the land is proven by Cauthorn to have been a Confederate price; the cash ■payment was Confederate, and the second instalment was received without objection in the same currency at a time when it had sunk to the ratio of six and a half' for one. As between the original parties to this contract — Wyatt and Crouch — there can be no difficulty in-declaring these notes to be payable in Confederate notes. Did the note purchased by Lohman lose this character, or wear any other aspect in its transfer to him ? Though negotiable, and for that cause protected in the hands of a holder for value against all equities *341 between tbe original parties to it, it was not thereby transmuted into a specie debt. There is no pretence for alleging that it was ever purchased or held as such; on the contrary, I have already endeavored to show from Lohman’s ■ answer that he set up no such claim, but actually submits to a scale of it as of its date or its value, as shown by the share of land for which it purported to have been given. The consideration which he gave for it consisted of Confederate notes, which from the time of its execution had so fallen as to require then four and a half for one. He, therefore, knew its character when he negotiated it.
Upon this point this case is decidedly stronger than that of Dearing’s adm’x v. Rucker, 18 Gratt. 426. There, the consideration of the bond was in part an antecedent specie debt; yet inasmuch as a check by which at one time the demand was liquidated, would have been payable in Confederate currency, and there was a novation of the debt by a loan, the court, while divided on the main question, concurred in treating the bond, which like the negotiable note here, merely called for dollars and cents, as clearly payable in Confederate currency. The president of the court, who dissented from the rule laid down in that case for the application of the scale, nevertheless agreed with the court as to the character of the bond in this particular, and regarded it, notwithstanding the absence of all reference to Confederate notes, as payable in them. The bond bore date the 14th June 1862, and referring to it, the president took this broad ground, that “ Confederate notes being the principal, if not the only currency of the country during the period aforesaid, it is fair to presume, in the absence of evidence to the contrary, that any contract made during that period was intended to be performed in that kind of currency, or was made with reference thereto as a standaad of value.” I fully concur in the reasonableness of this presumption ordi *342 narily, and applying it to the case at bar, I cannot conceive how any one can doubt that this note, whether in - the hands of the original payee, or a purchaser for value, is to be taken and treated as payable in Confederate notes, if current at its maturity.
An effort was made in the argument to liken this case to that of Omohundro v. Crump, 18 Gratt. 703, where the bond was held to be payable in the legal money of the country. But the transactions are of different dates, and are deemed, under the circumstances, to have reference to different currencies. The bond of Omohundro bore date on the 8th day of November 1861, before Confederate paper money had filled the channels of circulation. The table of value of Confederate currency, admitted by consent in this case, as evidence, commences with January 1862, showing conclusively that before that time this currency had either not so entered into circulation or been depreciated as to admit of such quotations in the mar-, ket. Besides the act of -March 3, 1866, for sealing Confederate debts, applied to no contracts entered into before the 1st of January 1862. The cases, therefore, are wholly dissimilar, and governed by different principles.
"Opon precedent, then, as well as reason, I think, we have satisfactorily ascertained that the note in question was payable at its maturity in Confederate paper money, if not then extinct as a circulating medium. It is material at this point to enquire whether there was any default on the part of the maker when it fell due. He is in a court of equity seeking a release of his land from the lien of this note; and if he is culpable or guilty of any default in its -payment, he might be required to account for the value of the land at the time of the purchase under the authority of White v. Atkinson, 2 Wash. 94. The reasoning of all the judges in that case shows that if it had been a specie contract, *343 performance of it would have been decreed upon the payment of the purchase money, as agreed, with interest; but in view of the fact that it was made on the - fluctuating basis of a depreciating currency, it was held that the purchaser under such circumstances shonld be required by the court of equity, whose aid he was seeking, to do equity, which was deemed to be, in that case, to pay the value of the land at the time of the contract, instead of the value of the money agreed upon. There the purchaser did not punctually pay, nor offer to pay, the purchase money according to his undertaking. Here, however, the facts are quite different. Let us first look into the bill and the appellant’s answer, and see how far the facts are conceded in the pleadings. The bill alleges that the complainant applied to Lohman in July 1863 to pay off and discharge the said note before its maturity; “but the said Lohman declined to receive the money in advance on the ground that he had no use for the money, and would rather wait until it became due.” The fact of such application is not material, except as displaying the animus of the parties, because there was no sort of obligation on the holder to receive payment till due. How is this allegation, however, met in the answer? Certainly not by a denial; but rather by an admission of an interview with the complainant about that time, when he was “asked if he did not want the money for the note, or some words to that effect, to which respondent replied, in substance, that the note was not due, and he did not want any money;” the respondent restricts his denial to the phrase, 4 he would rather wait until it became due;- so that the averment of the bill of the fact of this application is substantially uncontradicted by the answer. But the material averment of the bill is, that “when the note was approaching its maturity, the complainant, being sick at the time, sent to the said Lohman, by his daughter, the full amount of *344 said note in Confederate States treasury notes, and she, with the money in her hand, tendered him the sum due by said note,” which was refused on “ the ground that the currency had depreciated since he bought the note.” The version given by the answer is somewhat variant; the respondent states that “about the 19th of July 1864 the complainant came with a lady, whom this respondent understood to be his wife, to the residence of this respondent and offered to pay the amount of the note of $1,624 in Confederate treasury notes. This respondent refused to receive them, because siich notes were then depreciated enormously below the value of gold. Ho money was produced, and no tender actually made to this respondent, bnt if it had been, he would have refused it for the reason above stated.”
This fact then stands confessed by the pleadings, namely, that about the maturity of the note the holder was waited upon by the maker or his agent, and was offered the amount of the note in the currency, for which as we have seen it called. But whether this offer was so made as to constitute any actual tender, is the only point in issue ? This I think is determined by the testimony of Mrs. Walker, who made it. Her statement is, that when she called upon Mr. Lohman to pay this note, she informed him of her business, and “proposed to pay the money and get the note; that she had $1800 with her, held it in her hand, and showed it to him, and offered to pay him the amount of the note, but he declined it, saying he would not receive Confederate money, that he had paid gold and silver for the note, and would not receive, anything else.” It will be conceded that the legal incidents of a valid tender are the actual production and proffer of the precise sum due, so as to relieve the creditor of anything on his part to be done to reap the full fruition of his contract. But these may be dispensed with, either expressly or impliedly, by the creditor. The doctrine is *345 a reasonable one. It is accommodated to the circumstances of each case, so as to give to the respective parties the natural and intended benefits of their acts. Thus, if it be objected in this case that, according to the pretensions of Lohman, there was no actual production of the money, we may well exclaim what was the necessity of it, when his refusal was in no wise predicated of its non-production, but was such as to waive by the strongest implication the necessity of producing it; and again, if the objection be that the tender was for more than the whole debt, the question recurs, whether the creditor by not objecting for the want of change, but for a different and collateral cause, did not thereby abandon this objection. Thus, in the case of Bevans v. Rees, 5 Mees. & Welsb. R. 306, Lord Abinger said: “ I am not disposed to lay down general propositions, unless where it is necessary to the decision of the case; but I am prepared to say, that if the creditor knows the amount due to him, and is offered a larger sum, and without any objection on the ground of want of change, makes quite a collateral objection, that will be a good tender.” I conclude, therefore, that the tender in this case was a good one, and that if, instead of retaining the sum, the debtor had taken instant measures to set it aside, or bring it into court for the creditor’, it would have availed to stop interest. At any rate, the debtor has made no default, and in coming into equity for relief, need not be subjected to terms, and is well entitled to ask to stand upon the literal terms of his agreement, even upon the ruling in White v. Atkinson.
But the complainant in this case specially invokes the relief authorized by the 4th section of the act of March 3, 1866. This section contemplates and provides for two classes of “ bona fide and actual tenders in Confederate States treasury notes;” one of tenders at the maturity of the claim, and the other of tenders *346 after the maturity of the claim. In both a court of equity is authorized to grant relief, subject, however, to • two conditions: first, that it shall not appear “ that the creditor was justified in refusing to accept the amount tendered in consequence of a substantial and decided depreciation of said currency after the time at which payment ought to have been made, and before the time at which the tender was made; and secondly, that it shall not otherwise appear to be inequitable to grant such relief.” The first of these conditions is pregnant of meaning and instruction upon the application of the scale in this cáse. It bases an exception upon the fact of a signal depreciation between the time of maturity and the time of tender, leading irresistibly to the conclusion, that payment or tender of payment is regular, legitimate and unobjectionable at the former period. It virtually appoints the maturity of the claim as the time for ascertaining the value of the Confederate notes, or “ other equal or better currency” to be tendered or received in discharge of it. "We should, therefore, violate the plain meaning of this provision under which we are called upon in this case to act, if we were to yield to the appellant’s demand to scale his claim as of the date of its execution rather than of its maturity.
But it is supposed and urged that this 4th section should be controlled or modified in this respect so as .to be reconciled to the 2nd section of the same act, which, it is said, applies the scale at the date of the contract. But this assumption is incorrect. There is no such restriction in this section. It existed in the act of 1781 before the adoption of the constitution of the U. S. A new duty grew out of that constitution and was devolved upon the assembly of 1866; and that was, so to frame their laws for the adjustment of Confederate liabilities as not to violate the constitutional provision against laws impairing the obligation of contracts. In obedience to this requirement the *347 assembly of 1866 departed from the precedent of 1781, and instead of confining the scale to the time of the contract, as did the act of 1781, took care to provide the alternative of u such other time as may to the court seem right in the particular case,” so that the court might at all times, further and effectuate the understanding of the parties, and avoid any violation of their contract. It has been supposed that the fifth section of the act of 1781 assimilated that act to the present one so far as the designation of the time to apply the scale, is concerned ; but it is manifestly a larger discretion given the court “ to award such judgment as to them shall appear just and equitable,” without pointing specially as this latter act does, to the period of scaling. Upon this question of legislative intent, some light may be obtained by reverting to an antecedent law upon the subject of the currency. I refer to the act of October 14,1863, ordaining the currency in which contracts on or after the 20th of October 1863, shall be deemed to be payable. It designates it as “ the currency, which, at the time the contract becomes payable, shall be receivable in payments to the State, &c.” It is, therefore, another- and instructive instance, in which the legislature adopts “ the time the contract becomes payable” as the proper juncture to fix the liabilities of the parties.
But after all, the function of courts is restricted to the proper interpretation and due execution of contracts. They have no authority to modify or alter the contracts that may be submitted to them for construction or execution. "When the true understanding of the parties, has been arrived at it becomes in itself a law to the court, and demands a scrupulous fulfilment. The legislature, also, is incompetent to control or vary contracts, and any law having that effect, is simply void. Our enquiry in this case must, therefore, be directed to ascertain in what way the contract between the maker and holder of this note, is to be executed *348 under existing circumstances, in conformity with, its true obligation, and with legal principles.
They were both dealing in an unstable and precarious currency. It was inconvertible, and its payment, indefinite in point of time, was contingent upon the ratification of a treaty of peace between the Confederate States and the United States. We have only to revive our recollections by consulting the table that has been given in evidence, to renew our appalling sense of its rapid and progressive depreciation. We can more sensibly feel and test this by working out results by this table. Suppose, Lohman, in the choice offered him, had taken the first note of $1,537, he would only have given for it in gold $341, and would have realized at its maturity only $160, showing a loss upon the operation in the course of five months of $181. So, when he chose the second note, he paid for it in real value only about $383 11. Such experience banished credit from business and pecuniary transactions during the Confederacy, and made cash, a necessity in all dealings. Wherever credit was given, unless it was long enough to survive this currency, it necessarily entailed loss and often most grievous loss. Hence when the outcry of hardship is raised against the courts in the execution of these Confederate contracts, it is not due to their judgments, but rather to the evils inseparable from such a deplorable state of the currency. It is not in the power or within the province of courts to avert or redress ills proceeding from such a revolutionary state of society, trade and currency. If the appellant’s pretension is sustained, and this note is to be scaled as of its date, then he makes a profit of near $700, receiving $1,082 for what cost him in real value, but $383, at the time of his purchase; his claim, therefore, is two-fold; to escape what he denounces through his counsel here as an atrocious wrong, and reap a profit of a kind he could never have contemplated. *349 But if he may thus obtain a profit without the scope and intent of his bargain, may not his adversay enjoy a gain which results to him as the fruit of his bar- - gain ? In any event, there must be a loss on one side and a gain on the other, and it is the province of the court to fix it according to the understanding of the parties and the legal effect of their dealings.
Hazard and speculation, after a certain period, entered of necessity into all dealings with this paper money. I will not say that there might not have been some folks of small commerce in life or business, who regarded it and dealt with it as with stable and real values; but they were the exceptions from which no rule for judicial guidance can be safely or properly drawn. It is not, therefore, a matter of presumption to impute risk to Confederate credits at a marked stage of this depreciation; it was necessarily in the contemplation of the parties, at least, by intendment of law, if, in some rare cases, it were not so in fact. How else shall we account for the signal and notorious fact, that credit, from having universally prevailed, gave way during the Confederacy to. cash in all business transactions? It was plainly because credit in such a currency, was unsafe and impracticable.
"When we come, therefore, after the expiration of this currency, to pronounce upon debts payable therein at future dates, we must necessarily determine who, according to the fair intent of the parties and the principles of law, — creditor or debtor, — is to bear the loss incident to this depreciating medium. It will be readily conceded that it would be competent for the parties to provide for such contingency in their agreement; but in the absence of such provision we must look into the nature of the contract and the rights of the parties to discern where this liability properly rests. In case of a deferred payment, it -is but a reasonable inference that the debtor, in thus stipulating for credit, *350 bad a motive for it, and expected a benefit from it. "We may not know Or be able to conjecture tbe motive or the benefit; but be is not tbe less entitled to gratify tbe one or enjoy tbe other. ISTay, more; if be has no special design in tbe indulgence, for wbicb be bargains, and it be tbe mere result of a vague or visionary caprice, be acquires all tbe incidental advantages that attend upon tbis delay, whether contemplated or not, and they cannot be wrested from him without a violation of bis contract. When one engages to pay, at a future day, tbe notes of a depreciated and depreciating currency, who can rightfully undertake to say that tbe obligor did not count, as be reasonably might have done, upon a greater facility of payment from tbe greater cheapness of tbe paper, and tbe consequent advance of prices at that day ? Or bow can be be denied such advantages if they really occur, although be may not have reckoned or foreseen them ? Whatever may be bis bargain, be is entitled to its legitimate fruits. So, on tbe other band, if the creditor gets, on tbe agreed day, tbe commodity for wbicb he contracted, though fallen in value' since tbe date of tbe contract, be suffers no wrong, though it prove a loss, for tbe simple and obvious reason that be gets all be bargained for; and in case of default, bis measure of recovery is tbe value of tbe commodity at tbe time of delivery, and not at tbe date of tbe contract.
Tbis reasoning is strikingly exemplified by tbe facts of tbis case. Tbe appellee, Crouch, got two years’ time on bis purchase. Tbis indulgence was, of course, a material and valuable ingredient in bis contract. Tbe medium of payment became so cheapened, that at tbe end of one year be sought to discharge both of tbe deferred instalments, and failing at that time to retire, bis last note, be was prompt and particular in offering to meet it at maturity. Can it be denied that be faithfully did all be agreed to do ? Tbe only justification at *351 tempted for the rejection of this tender, was the great depreciation of the paper; hut there seems to me to be no mode of sustaining this plea, except by interpola- - ting in the contract a condition that does not pertain to it; namely, to be payable in Confederate notes, provided they had not fallen in value since the contract. It is needless to say that the whole spirit of the law, which inflexibly upholds the sanctity of contracts, would revolt against such a change of the agreement, and such a dangerous precedent as it would be of the deliberate infraction of the terms of the parties. The obligation of the creditor to assume the risk of depreciation in such a case, inheres, ex justitia, in his agreement to receive at a future day depreciating paper money. He was bound to contemplate the probability of a further decline, and if he did not guard against it it was his fault, and he must take the consequences. That this contingency was in the mind of the appellant, is probable from his selection of the last note. He, doubtless, thought that safest, as it had the greater chance of surviving the war, and of being realized in a better or improved currency. Should he thus bargain for this benefit, and now refuse to bear the adverse chance which has befallen him ? It is never a hardship to be required to abide one’s bargain; there may be an individual loss in it; but it becomes a solemn pledge to the public of the cost at which the law protects the interest of trade, the honor of pecuniary ■dealings, and the sanctity of contracts.
This appeal was, doubtless, allowed to give us an opportunity of reviewing the case of Dearing’s adm'x v. Rucker, in which there was a division of opinion. I have accordingly reconsidered that case'in its bearing upon this, with a full and honest purpose to change my opinion, if, upon a patient review of it, I became aware of its error. I have not,- therefore, gone over the grounds or authorities that were so well taken and *352 expounded by my brother Joynes in that case, but have only pursued with brevity the course of reasoning that led me to concur in his opinion, and now conducts me to a reaffirmance of it.
For these reasons, I am of opinion that there is no error in the decree of the court below, which may not be amended here. As already intimated, interest should be allowed on the sum decreed, from the date of the tender, the 19th of July 1864.